**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| INTERNATIONAL ASSOCIATION OF SHEET METAL, AIR, RAIL AND TRANSPORTATION WORKERS, TRANSPORTATION DIVISION, *et al.*, | ) ) ) ) ) | CASE NO. 1:21-cv-01870<br><br>JUDGE DAVID A. RUIZ |
| Plaintiffs, | ) ) ) | **MEMORANDUM OPINION AND ORDER** |
| v. | ) ) | |
| NORFOLK SOUTHERN RAILWAY COMPANY, | ) ) ) | |
| Defendant. | ) | |

Plaintiffs International Association of Sheet Metal, Air, Rail and Transportation Workers,

Transportation Division, Smart-TD General Committee of Adjustments GO-169, Smart-TD

GCA-680, Smart-TD GCA-687, and Smart-TD GCA-898 (hereafter collectively "Plaintiffs" or

"SMART-TD") filed the present action to which Defendant Norfolk Southern Railway Company

("NSR") filed an Answer and Counterclaim. (R. 1; R. 9). The matter was reassigned to the

undersigned District Judge and following a telephone conference the Court established a limited

discovery and briefing schedule for the parties' cross motions for summary judgment. (R. 28).

All pending motions at that juncture were denied without prejudice as moot. (R. 29). The parties have received multiple extensions of time for discovery while considering potential resolution. Now pending before the Court are the following: the parties' Joint Stipulated Facts and Stipulated Record (R. 40),[1] the parties' respective motions for summary judgment (R. 42 & 43), their respective briefs in opposition (R. 45 & 46), and their respective reply briefs. (R. 47 & 48).

Plaintiffs accuses Defendant of unilaterally abrogating their agreement, "which prohibit the Carrier from utilizing Engineers to perform Conductor work." (R. 431, PageID# 1144). However, Plaintiffs' position is actually far less absolute, as made clear in their reply: "At all times, the issue in dispute has been that NS has been calling Engineers to fill Conductor vacancies <u>when there are rested Conductors available and ready to work</u>." (R. 48, PageID# 1450-1451) (emphasis in original). Thus, the dispute does not revolve around the assertion that the underlying crew consist agreements outright prohibit Defendant from calling Engineers to fill temporary Conductor vacancies, but only that such a practice is prohibited when there are rested Conductors available. Defendant NSR maintains it has a "decades-old practice of calling employees who maintain Conductor seniority to fill temporary Conductor vacancies, even if the employee was holding an Engineer position at the time" and that any dispute over the interpretation of the parties' agreements amounts to a "minor dispute" in the parlance of the RLA, and deprives this Court of subject-matter jurisdiction. (R. 42-1, PageID# 780-781).

## I.      Relevant Facts

Plaintiff SMART-TD is the duly authorized "representative" of train service employees, including Conductors, employed by NSR, and the GCAs are the bodies with jurisdiction over

---

[1] The parties were only able to agree on the most basic facts despite the lengthy period of discovery. (R. 40).

negotiating collective bargaining agreements and handling claims and grievances arising thereunder. (R. 40, PageID# 768). Defendant NSR is a "carrier" as defined by the RLA. *Id*. The respective SMART-TD GCAs and NSR are parties to several collective bargaining agreements that control the terms and conditions of employment for the class and/or craft of train service employees represented by SMART-TD. (R. 40, PageID# 769). The crafts of Engineer and Conductor are distinct crafts with distinct collective bargaining agreements governing the terms and conditions of employment. *Id*. The union Brotherhood of Locomotive Engineers and Trainmen ("BLET") is the duly authorized "representative" of Engineers employed by NS. (R. 40, PageID# 768).[2]

**A.     Crew-Consist Agreements from 1984**

The parties stipulate that "[Defendant] NSR and the [Plaintiffs] SMART-TD GCAs are parties to [collective bargaining agreements] which contain what are called "Crew-Consist Agreements." (R. 40, PageID# 769, ¶8). These Crew Consist Agreements "establish the composition of the train crews," and Article 4 of each of these respective agreements contains the following provision:

> (b) No Carrier supervisor, yardmaster, official, **engine** or non-craft employee will be used to supplement, supplant or substitute in the work of any train or yard crew working under UTU Agreements.

(R. 40, PageID# 769, ¶8) (emphasis added).

Article 4 of the 1984 Crew Consist Agreement between NSR and GO-680 is "virtually

---

[2]  The Court notes that a parallel lawsuit was filed by BLET, which represents the engineers, in Case No. 1:21-cv-1866 against the same Defendant—Norfolk Southern, which is also before this Court. While the Court addresses these lawsuits separately, the Court is mindful of the interplay between these two crafts and their common employer. The decision in this case and in Case No. 1:21-cv-1866 are intended to be read consistently and *in pari materia*.

identical," and states, in pertinent part, as follows:

> (b) No Carrier supervisor, yardmaster, official, **engine** or non-train service employee will be used to supplement, supplant or substitute in the performance of service which is assigned to any road or yard service employee(s) and to which entitled under applicable UTU Agreements.

*Id*.  (emphasis added).

**B.     Conductor Craft Becomes Source for New Engineers**

Not long after the 1984 Crew Consist Agreements, collective bargaining agreements between BLET, SMART-TD and NSR, eliminated the craft designation of Fireman, and new Engineers were promoted from the Conductors craft. (R. 42-2, PageID# 802, Decl. of Andrew Shepard at ¶¶5-6).[3] Engineers hired after November 1, 1985—virtually all engineers—hold seniority both as Engineers and as Conductors, and "such employees who are qualified and hold seniority in both crafts are required to fill or – in railroad terminology – 'protect' vacancies in either craft, depending on the needs of service and the employee's seniority." *Id*. at ¶¶5, 8, 10. Under current labor agreements, Defendant must assign *both* an Engineer and a Conductor to most trains, and an unfilled vacancy in either craft prevents the train from moving. *Id*. at ¶5.[4]

The parties stipulate that "[t]he entry or return to the Conductor or Engineer craft is governed by the appropriate CBA. The CBAs governing the Conductor craft generally prohibit other crafts from being assigned to perform Conductor work." (R. 40, PageID# 769, ¶7).

The parties further stipulate that "Conductors working pool assignments are called, or

---

[3] Andrew Shepard is an Assistant Vice President of Labor Relations for the parent company of Defendant NSR. (R. 42-2, PageID# 800, Shepard Decl. at ¶1).
[4] Engineers who are working as Conductors are sometimes referred to as "demoted Engineers," and his or her rate of pay, while working as a Conductor, are governed by the collective bargaining agreement between NSR and with SMART-TD, which represents Conductors. (R. 42-2, PageID# 804-805, Shepard Decl. at ¶¶11-13).

4

assigned, to fill positions based on seniority, on a first in, first out basis. First in, first out means those who are first in, get rested and stand to be called again in the order that they arrive into the home or away-from-home terminal. The system for calling or assigning Conductors to craft assignments when an unplanned vacancy exists is set forth in what is referred to as decision tables. These tables detail how employees will be called, or assigned, within a specific district when a vacancy exists in that pool." (R. 40, PageID# 769-770, ¶9).

Defendant's Director of Crew Management, Cecil Smith, Jr., avers that "NSR assembled a listing of each instance an employee then assigned to an Engineer position filled a temporary Conductor vacancy from 2015 through 2020," that he reviewed said listing attached to his declaration as Exhibit E, and that Exhibit E excludes "demoted Engineers" being assigned to fill Conductor vacancies and "only includes employees holding a regular assignment as an Engineer who were called to fill Conductor vacancies." (R. 42-3, PageID# 928-929, Smith Decl. ¶14). Smith asserts that his review revealed that such occurrences were common practice, occurring "on average, over 25 times per week during the 2015 to 2020 time period and has continued through today." *Id.*

Plaintiffs aver that Defendant's computer system is set up to automatically assign Conductors in accordance with the aforementioned decision tables for a particular pool, but assert that beginning in August of 2021, "NSR has been manually overriding the system and force assigning Engineers to Conductor assignments on the Radford District, Bluefield District, and Elmore District, within the Blue Ridge Division." (R. 43-2, PageID# 1160, Declaration of David W. Phillips at ¶6).[5] Despite the lengthy period of discovery afforded to the parties, GC

---

[5] David W. Phillips is the General Chairperson ("GC") of the Transportation Division of the International Association of Sheet Metal, Air, Rail and Transportation Workers ("SMART-TD")

Phillips offers no foundation or evidence to support the assertion Defendant "has been manually overriding the system" or that such occurrences are regular or frequent. GC Phillips does make the vague assertion that "on August 9, 2021, the Carrier forced an Engine service employee to work as a Conductor on the Radford District, Blue Ridge Division in violation of the CBA." (R. 43-2, PageID# 1160, Phillips Decl. at ¶6).

The Declaration of James E. Ball, Jr.[6] gives four less cryptic examples of such occurrences allegedly occurring in September of 2021 based on "work history screenshots" attached to his declaration. The Court cannot discern the import of these screenshots, and declines to presume that these show examples of Defendant assigning or forcing engineers to fill conductor assignments where a rested conductor was available. Nevertheless, assuming *arguendo* that these assertions are of evidentiary quality, they fail to factually establish anything approaching a regular, routine, or systemic practice of calling and/or forcing engineers to fill a vacancy where a rested conductor is available versus isolated deviations from standard practice.

It bears reiterating that Plaintiffs' position is not that engineers could *never* be called to fill temporary vacancies under the aforementioned crew consist agreements, but rather "[a]t all times, the issue in dispute has been that NS has been calling Engineers to fill Conductor vacancies <u>when there are rested Conductors available and ready to work</u>." (R. 48, PageID# 1450-1451) (emphasis in original).

According to Defendant's Director of Crew Management Declaration, he has overall

_____

General Committee of Adjustment ("GCA") GO-680. (R. 43-2, PageID# 1158, Phillips Decl. at ¶1).
[6] James E. Ball, Jr. is the General Chairperson ("GC") of the Transportation Division of the International Association of Sheet Metal, Air, Rail and Transportation Workers ("SMART-TD"), formerly United Transportation Union ("UTU"), General Committee of Adjustment ("GCA") GO-687. (R. 43-3, PageID# 1187, Ball Decl. ¶1).

supervisory responsibility for NSR's Crew Management Center ("CMC"), which is responsible for calling NSR employees to fill assignments and consists of ten desks operating 24 hours per day, 7 days per week. (R. 42-3, PageID# 924, Smith Decl. at ¶3). When conductor vacancies occur, the CMC will first attempt to fill the vacancy by calling rested, available Conductors through the Extra Board—rosters of conductors or engineers not otherwise assigned. *Id*. at ¶¶ 4-5. If the CMC is unable to fill the vacancy through the Extra Board, the Crew Dispatcher will utilize the Decision Tables—guidelines used to identify the order in which qualified and rested employees are called to protect unplanned vacancies—of which hundreds are in use across Defendant's system. *Id*. at ¶5. Decision Tables are computerized and present to a Crew Dispatcher the next employee to call in an attempt to fill a vacancy. *Id*. "An 'override' code appearing on an employee history report does not indicate that NSR disregarded the Decision Table," as "override" codes may arise in various circumstances during the vacancy filling process, such as when an employee who was previously called did not answer, but calls back to fill the vacancy. *Id*. at ¶11.

Smith asserts that it is "ordinarily inefficient to call Engineers, even though they are also certified as Conductors, because the employee then will be temporarily unavailable to protect an Engineer assignment requiring certification as an Engineer. The computerized Decision Tables therefore will initially suppress the names of rested and available employees with Conductor seniority who currently hold positions as Engineers. However, when all other sources of rested and available employees with Conductor seniority and qualifications are exhausted, then one of the last decision step(s) may show the names of rested and available employees with Conductor seniority, including those holding assignments as Engineers." (R. 42-3, PageID# 926, Smith Decl. at ¶6).

7

VP Shepard's declaration states that "NSR currently makes thousands of starts per week in engine and ground service" but a "small number of errors inevitably will occur[,] [but] [i]n these rare instances, the affected employees or the Unions can file claims through the normal grievance procedure, to be progressed according to Section 3 of the Railway Labor Act." (R. 42-2, PageID# 810, Shepard Decl. at ¶28). VP Shepard points to an example, albeit a rather old one, from 1995 where a claim was submitted on behalf of a conductor who was deprived of two work opportunities to work as an engineer and was paid for them. (*Id.*; R. 42-2 at PageID# 876-77, Exh. M).

## C.  Arbitration Decisions and Past Practice

In 2011, a dispute existed between SMART-TD's predecessor and Defendant NSR concerning whether a furloughed conductor should have been called to fill a temporary vacancy over an engineer. (R. 42-2, PageID# 883, Exh. P, Award No. 76, Case No. 76 of Public Law Board 5811). There was "no dispute that conductor vacancies … are filled from the Conductor's … Extra Board, working on a first-in, first-out basis in accordance with … the Conductor's Schedule Agreement. However, on the date at issue the Extra Board was exhausted of rested and available conductors to cover the vacancy. The Carrier therefore called and used an employee who was a qualified conductor, albeit that employee had previously left train service for work as a locomotive engineer." *Id*. The furloughed conductor's claim was denied by the neutral arbitrator, who noted that "[i]t has been held on a number of occasions over the years that there may be occasion for an employee from a different class or craft of service to be used for a temporary vacancy when no one is available to fill a must need position." *Id*.

In a May 17, 2016 letter, SMART-TD General Chairman James A. Houk alleged Defendant was violating the collective bargaining agreement by utilizing "engineers to fill

temporary conductor vacancies on a regular basis…" (R. 42-2, PageID# 865, Exh. H). In a

responsive letter dated May 20, 2016, VP Shepard disagreed writing as follows:

> Contrary to your assertion, employees with train service seniority who are
> working as engineer may be required to protect their train service seniority. This
> principle has been upheld by a variety of Arbitral tribunals. Moreover, I disagree
> that there has been any violation of the Schedule Agreement or that actual
> objective-working conditions have been changed.

(R. 42-2, PageID# 867, Exh. I). Shepard attests that a subsequent conference occurred between

himself and Houk as required by the RLA, and Defendant and Chairman Houk agreed that "any

further dispute over the subject would be handled through the grievance procedure required by

the RLA, *i.e.*, as a minor dispute." (R. 42-2, PageID# 808, Shepard Decl. at ¶25). A subsequent

letter from Shepard to Houk, dated August 12, 2016 stated as follows:

> During our meeting, the Carrier maintained that calling an engineer to fill a
> temporary train service vacancy does not violate Article 8 of the 1984 Crew
> Consist Agreement, or any other provision of the schedule agreement, or
> constitute a change in "actual objective-working conditions." The Carrier further
> outlined Arbitral precedent and past claim settlements supporting its position.
> Without surrendering its position, the Organization recognized that the number of
> occurrences had diminished since our last meeting.
>
> At the conclusion of our meeting, **the Organization acknowledged that any
> further progression of this issue would be done in accordance with the
> grievance and time claim provisions** of the applicable schedule agreement.

(R. 42-2, PageID# 869, Exh. J) (emphasis added). Shepard attests that "Mr. Houk never

challenged my summary of the conclusion of our discussion." (R. 42-2, PageID# 809, Shepard

Decl. at ¶25).

In an April 28, 2021 email, SMART-TD General Chairman Tommy Gholson protested

that an employee, holding a position as an engineer, was being required to fill multiple days of a

conductor vacancy "and this should only be for one day only until there are rested CO's." (R. 42-

2, PageID# 871, Exh. K).[7] Shepard indicates that Chairman Gholson's email "acknowledged that NSR had the right to require the employee working as an Engineer to protect the temporary Conductor vacancy; he simply complained that NSR should release the employee from the temporary vacancy when rested employees normally assigned as Conductors became available." (R. 42-2, PageID# 809, Shepard Decl. at ¶26).

On August 11, 2021, a SMART-TD Local Chairman filed a penalty claim on his own behalf arguing a violation of the collective bargaining agreement because Defendant failed to call him, in seniority order, to protect a vacancy in a conductor position despite being an engineer. (R. 42-2, PageID# 809-810, 874 Shepard Decl. at ¶27 and Exh. L).

**D.  2016 Flowback Agreements**

In 2016, Defendant NSR, BLET, and three of the four SMART-TD General Committees of Adjustment entered into amended "Flowback Agreements," that allowed Engineers to "flowback" and work as Conductors. (R. 42-2, PageID# 804, Shepard Decl. ¶12). Two of the three 2016 Flowback Agreements contain the following language:

> When it becomes necessary to reduce the number of engineers at a location/supply point, engineers designated as flowback engineers will be returned to train service (in engineer's seniority order) ahead of other engineers. If the reduction in engineers at a location/supply point exceeds the number of engineers designated as flowback **or there are no engineers designated as flowback at the location /supply point, engineers who are not designated as flowback will be sent to train service in reverse seniority order**.

> The parties agree that the process by which temporary engineer vacancies are filled remains unchanged by the terms of this Agreement, except engineers in train service as a result of this Agreement will be called after other demoted engineers to protect temporary engineer vacancies.

---

[7] Shepard indicated that "[w]hen filling a multiple-day vacancy at an outlying location, it is common for NSR to require the employee to protect the vacancy for multiple days (where the employee is provided lodging and meals) to avoid unproductive travel time back and forth to the outlying location (referred to as 'deadheading')." (R. 42-2, PageID# 809, Shepard Decl. at ¶26).

(R. 42-2, PageID# 845, 850, Exh. C) (emphasis added). While the agreements are not a model of clarity, they generally "provide for the flowback of employees from engine to train service." (R. 42-2, PageID# 843, Exh. C).

## II. Legal Standard

In order to address the parties' motions for summary judgment, the Court must first decide if the parties have a major or minor dispute. Congress created separate mechanisms to resolve major and minor disputes in an effort to "prevent labor unrest and interruption of interstate commerce." *Wheeling & Lake Erie Ry. Co. v. Bhd. of Locomotive Engineers and Trainmen*, 789 F.3d 681, 690 (6th Cir. 2015); *accord Int'l Ass'n of Sheet Metal, Air, Rail & Transp. Workers – Transp. Div. v. CSX Transp., Inc.*, No. 1:21-cv-1240, 2022 U.S. Dist. LEXIS 30283 (N.D. Ohio, Feb. 21, 2022) (Gwin, J.) The Sixth Circuit Court of Appeals explained as follows:

> Major disputes rest on the authority of 45 U.S.C. § 152 Seventh and 45 U.S.C. § 156, and relate to disagreements over the formation of collective bargaining agreements (CBAs) or efforts to procure them. Such disputes arise where a CBA does not exist or where one of the parties seeks to change the terms of an existing CBA. The issue in a major dispute is not whether an existing agreement controls the controversy; instead, the focus is on the acquisition of rights for the future, not [the] assertion of rights claimed to have vested in the past.
>
> ***
>
> By contrast, minor disputes are predicated on 45 U.S.C. § 152 Sixth and 45 U.S.C. § 153 First. A minor dispute contemplates the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. The parties' dispute concerns a grievance about either the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case. If the dispute centers on an omitted case, the claim is founded upon some incident of the employment relation, or asserted one, independent of those covered by the collective agreement. Whether the parties' dispute relates to application of a particular CBA provision in a specific situation or to application of a CBA

11

provision to an omitted case, the claim is to rights accrued, not merely to have new ones created for the future. Minor disputes inevitably appear in executing major agreements and policies or arise incidentally in the course of an employment. They relate to specific maladjustments of a detailed or individual quality. They seldom produce strikes, though in exaggerated instances they may do so.

The RLA directs parties to negotiate a minor dispute, but if negotiation is unsuccessful, the procedural pathway set out for **minor disputes requires the parties to submit the dispute to compulsory and binding arbitration** before the National Railroad Adjustment Board (NRAB) or, alternatively, to an adjustment board established by the carrier and the employees.

*Wheeling & Lake Erie Ry. Co.*, 789 F.3d at 691 (internal citations and quotation marks omitted) (emphasis added); *accord Flight Options, LLC v. Int'l Bhd. of Teamsters, Loc. 1108 (Flight Options II)*, 873 F.3d 540, 544 (6th Cir. 2017) ("Minor disputes … arise from disagreements about how an existing collective-bargaining agreement applies to a particular situation. Again, the parties must first attempt to negotiate privately. But if negotiations over a minor dispute fail, the parties must proceed directly to binding arbitration. The court plays no role in resolving minor disputes unless a party asks it to review the arbitrator's decision.") (citations omitted). As the Supreme Court has explained, "major disputes seek to create contractual rights, minor disputes to enforce them." *Consol. Rail Corp. v. Ry. Lab. Executives' Ass'n*, 491 U.S. 299, 302, 109 S. Ct. 2477, 2480, 105 L. Ed. 2d 250 (1989).

The Sixth Circuit has echoed that principle, stating "**The core distinction between these two types of disputes is that major disputes seek to create contractual rights, minor disputes to enforce them**." *Flight Options, LLC v. Int'l Bhd. of Teamsters, Loc. 1108 (Flight Options I)*, 863 F.3d 529, 538 (6th Cir. 2017) (*quoting Consol. Rail Corp. v. Ry. Labor Execs.' Ass'n,* 491 U.S. 299, 302 (1989) (internal quotation marks omitted, emphasis added). Minor disputes involve "interpretation or application of particular provisions of existing collective

bargaining agreements," *United Transp. Union v. Cuyahoga Valley Ry. Co.*, 979 F.2d 431, 434 (6th Cir. 1992), and are committed to grievance arbitration. *See Flight Options I,* 863 F.3d at 539.

Moreover, "Courts apply a strong presumption in favor of finding a minor dispute." *Int'l Ass'n of Sheet Metal, Air, Rail & Transp. Workers - Transp. Div. v. CSX Transp., Inc*., 2022 U.S. Dist. LEXIS 30283 *; 2022 WL 524772 (N.D. Ohio Feb. 21, 2022) (Gwin, J.) Where "an employer asserts a claim that the parties' agreement gives the employer the discretion to make a particular change in working conditions without prior negotiation, and if that claim is arguably justified by the terms of the parties' agreement (*i.e.*, the claim is neither obviously insubstantial or frivolous, nor made in bad faith), the employer may make the change and the courts must defer to the arbitral jurisdiction of the Board" and dismiss the case. *Consol. Rail Corp. v. Ry. Lab. Executives' Ass'n*, 491 U.S. 299, 310 (1989). The Supreme Court has explained that the RLA places a "relatively light burden" on a railroad to show that a dispute is minor and must go to arbitration. *Id*. at 307. "[S]o long as the party's proffered interpretation is not 'frivolous or obviously insubstantial,' the dispute is minor." *Flight Options II*, 873 F.3d at 544 (*quoting Conrail*, 491 U.S. at 307).

Furthermore, collective bargaining agreements differ from ordinary contracts.

It is not unqualifiedly true that a collective-bargaining agreement is simply a document by which the union and employees have imposed upon management limited, express restrictions of its otherwise absolute right to manage the enterprise, so that an employee's claim must fail unless he can point to a specific contract provision upon which the claim is founded. There are too many people, too many problems, too many unforeseeable contingencies to make the words of the contract the exclusive source of rights and duties. One cannot reduce all the rules governing a community like an industrial plant to fifteen or even fifty pages. Within the sphere of collective bargaining, the institutional characteristics and the governmental nature of the collective-bargaining process demand a **common law of the shop which implements and furnishes the context of the agreement**.

*United Steelworkers of Am. v. Warrior & Gulf Navigation Co*., 363 U.S. 574, 579-80, 80 S. Ct. 1347, 1351 (1960) (emphasis added). "The core duties imposed upon employers and employees by the RLA … are to 'make and maintain agreements' and to 'settle all disputes ... in order to avoid any interruption to commerce.' Referring arbitrable matters to the Board will help to 'maintain agreements,' by assuring that collective-bargaining contracts are enforced by arbitrators who are experts in 'the common law of [the] particular industry.'" *Conrail v. Ry. Labor Executive" Ass'n*, 491 U.S. 299, 310-11, 109 S. Ct. 2477, 2484 (1989)

### III. Decision

Plaintiffs SMART-TD *et alia* and Defendant NSR have presented this Court with a *minor* dispute. The terms of the 1984 crew consist agreements do not expressly address the issue. Because of the age of the agreement, it fails to account for the change that occurred in 1985 when new engineers were selected from the ranks of conductors rather than the craft of firemen, which was eliminated. The 2016 flowback agreements, to which SMART-TD and BLET are parties, do not preclude Defendant from calling engineers to work as conductors when non-engineer conductors are unavailable. Furthermore, the language in the flowback agreements arguably lends support to Defendant's position that it has the authority to do so, or, at the very least, renders Defendant's position non-frivolous.

In other words, while Plaintiffs maintain Defendant's practice somehow violates the terms of the crew consist agreements, neither party points to any language in that agreement that *clearly and unambiguously* prohibits or allows such a practice. While it is Plaintiffs' position that Defendant's practice has changed and that it now calls engineers to fill conductor vacancies even when a rested conductor is available, it has not set forth any evidence that such an alleged

14

practice occurs with any regularity or intention.

In addition, the parties' past practice supports the finding that Defendant NSR was interpreting the existing agreements it has with Plaintiffs rather than attempting to create new contractual rights that were expressly precluded by these agreements.

As the Court finds a minor dispute, it lacks jurisdiction to decide this matter under the Railway Labor Act.

**A.**    **Crew Consist Agreements and Flowback Agreements**

Defendant need not persuade the Court that its interpretation of the agreements is correct, nor does it have a substantial burden to show that its interpretation of said agreements is not frivolous or insubstantial. As set forth above, courts apply a strong presumption in favor of finding a minor dispute. Past practice, which will be discussed in the following section, is considered only to determine whether the employer has made a non-frivolous argument.

Plaintiffs had initially asserted that the controlling agreements "explicitly prohibits" Defendant from using "non-craft employees, specifically including Engineers, to perform Conductor work." (R. 46, PageID# 1342).[8] Plaintiffs' subsequent filing appears to withdraw that position by conceding that the only issue "in dispute has been that NS has been calling Engineers to fill Conductor vacancies when there are rested Conductors available and ready to work." (R. 48, PageID# 1450-1451) (emphasis in original). Indeed, given the evidence that Defendant has called engineers to fill conductor vacancies over 6,000 times between 2015 and 2020, it would be difficult to argue that the practice is not accepted by the parties. (R. 42-3, PageID# 928-929,

---

[8] Plaintiff's Chairpersons Ball and Phillips' Declarations even states that "[n]owhere in the decision table is there any entry to allow the Carrier to call an Engineer for a Conductor vacancy." (R. 43-2, PageID# 1160; R. 43-3, PageID# 1189).

Smith Decl. ¶14).

Plaintiffs' interpretation of the crew-consist agreements is unsupportable, as the language they point to suggests a maximalist, outright prohibition against engineers, demoted or otherwise, ever working as conductors when in fact decades of conduct fly in the face of such an interpretation. To the extent Plaintiffs argue that the crew-consist agreement permits engineers to fill temporary conductor vacancies, but only when there are no rested conductors available, such language is nowhere to be found in the agreements.

As discussed in the section below as well as set forth above in the relevant facts section, Defendant has long maintained its position that it can call engineers to protect temporary conductor vacancies. Although no language in the crew consist agreements expressly confirms Defendant's position, it is not expressly precluded either. As noted above, the changes occurring in 1985 that altered the source of engineers who would now come from the ranks of conductors—occurring the year *after* the 1984 crew consist agreements affected major changes in the railway industry that are unaccounted for by the earlier agreements. Given this backdrop, the crew-consist agreements' provisions contain a glaring absence that does not expressly address the issue at hand. As such, the Court finds the crew-consist agreements are effectively silent on the issue of engineers filling temporary *conductor* vacancies.

The 2016 Flowback Agreements are material to the present dispute and aid in understanding the parties agreed course of conduct. Two of the three 2016 Flowback Agreements contain the following language: "which provide for the flowback of employees from engine to train service." (R. 42-2, PageID# 843, 848, Exh. C). Section D of one of these agreements also states that "[e]mployees working in engine service on the Option Date who are designated as 'flowback' and moving to train service will be added to the train service extra board…." And it

16

even allows engineers "designated as flowback at a location/supply point … to exercise seniority to/remain in train service." *Id.* at PageID# 849.[9]

The very presence of the Flowback Agreements, to which Plaintiffs agreed, is indicative of the large gaps in the 1984 crew consist agreements as it pertains to temporary vacancies. To the extent the crew consist agreements could be construed as precluding the movement between these two crafts, the flowback agreements certainly altered any such understanding.

Defendant has likened this matter to a recent decision from this district court—*Int'l Ass'n of Sheet Metal, Air, R. & Transp. Workers – Transp. Div. v. CSX Transp., Inc.* (R. 42-1, PageID# 795), where the collective bargaining agreement did "not say what should happen after the employer exhausts the agreed-upon vacancy fill logic." 2022 WL 524772 (N.D. Ohio, Feb. 21, 2022) (Gwin, J.). Plaintiff attempts, unsuccessfully, to argue the case is distinguishable because "there is an **explicit prohibition** in the parties' agreement against the very actions that NS is taking unilaterally here, that is, force assigning a non-craft Engineer to fill that vacancy." (R. 46, PageID# 1355) (emphasis added). The crew consist agreements certainly do *not* explain the process for filling temporary vacancies. But a maximalist interpretation of the crew consists agreements—that engineers can *never* work as conductors under any circumstances—is contradicted by the flowback agreements and does not appear to be an argument that Plaintiffs actually advance.

The Court agrees with the above decision, and faced with this silence or ambiguity in the crew consist agreements, applies the presumption in favor of finding a minor dispute. It is not the

---

[9] The other agreement contains similar language in Section D. (R. 42-2, PageID# 844) ("An employee exercising train service seniority rights … will be added to the ground service extra board ….)

Court's function to decide which party has offered a more persuasive interpretation of said agreements. However, the Court is unconvinced that the language of these agreements should be read as expressly prohibiting the disputed practice. The crew consist agreements, in conjunction with the flowback agreements and past practice discussed *infra*, provide ample support for finding Defendant's position is not frivolous, insubstantial, or asserted in bad faith.

**B.      Past Practice**

The parties' past practice with respect to this issue supports a finding that the existing dispute is a minor one.

When evaluating a claim under the RLA, courts may consider past practices to decide whether the collective bargaining agreement arguably supports a party's proffered interpretation. *See, e.g., Flight Options I*, 863 F.3d at 542 ("A claim is 'arguably justified' if any reasonable labor arbitrator, applying appropriate principles of contract interpretation and after reviewing relevant extrinsic evidence (such as evidence of past practice), could find that the contract *does justify* a party's claimed right to take, or to refrain from taking, an action."). The "relevant terms" of an agreement are not confined to those that are written down; "they also include the parties' practice, usage, and custom as they carry out their agreement." *Bhd. of Locomotive Eng'rs & Trainmen (Gen. Comm. of Adjustment, Cent. Region) v. Union Pac. R.R. Co.*, 879 F.3d 754, 758 (7th Cir. 2017). This Court's role is *not* to utilize past practice to actually decide the exact scope of an employer's authority under the collective bargaining agreement, as "[w]ading through the competing declarations to determine the actual authority the Railroad had to modify the disciplinary policies, based on past practices, is a job for the arbitrator." *Id*. at 759.

Here, the dispute over whether the Defendant may call engineers to fill temporary conductor vacancies where no rested conductors remain, as discussed *supra* and in the Court's

decision in the companion case concerning BLET, has a thirty-plus year history.

The Court declines to recount all the facts above or all those set forth in the Court's decision in the companion case. However, to summarize, a neutral arbitrator in 1991 found an engineer was "obligated" to work as an emergency conductor. (Case No. 1:21-cv-01866, R. 45-2, PageID# 803, Exh. N, Award No. 32 of Public Law Board 4417).

Back in 1993, BLET's predecessor and Defendant settled a similar grievance by mutually agreeing that "conductor and trainman positions" could be filled by engineers in an emergency after exhausting the ranks of conductor and trainman. (Case No. 1:21-cv-01866, R. 45-2, PageID# 779, Exh. D).

In 2000, Defendant sent BLET's chairman a letter expressly setting forth its position that "the Carrier has the right to use engineers to fill conductor vacancies. This right is confirmed by prior understandings, time claims, claim settlements, and arbitration decisions with your Organization. In light of the above, there is absolutely no basis for your assertion that this issue rises to the level of a major dispute." (Case No. 1:21-cv-01866, R. 45-2, PageID# 781, Exh. E).

In 2003, a letter to BLET's chairman from Defendant asserted that "[t]he Carrier has consistently maintained and arbitral decisions have upheld that engineers must protect their seniority as conductors in emergency situations. The Carrier's practice for at least fifteen years has been to use engineers in the order of their conductor seniority when all train service sources of supply have been exhausted." (Case No. 1:21-cv-01866, R. 45-2, PageID# 783, Exh. F). In the same year, a Public Law Board "urge[d] the parties to continue their previous broad discussions on this general topic as detailed in the Organization's submission and to reach an agreement to avoid any continuing future disputes on the manner, extent, pay and discipline regarding the utilization of demoted engineers working under the Conductors' Schedule Agreement who are

19

utilized to protect, temporary engineer assignments." (Case No. 1:21-cv-01866, R. 45-2, PageID# 825, Exh. R).

During a 2011 dispute between Plaintiffs' predecessor and Defendant concerning whether a furloughed conductor should have been called to fill a temporary vacancy over an engineer, a neutral arbitrator noted that "[i]t has been held on a number of occasions over the years that there may be occasion for an employee from a different class or craft of service to be used for a temporary vacancy when no one is available to fill a must need position." (R. 42-2, PageID# 883, Exh. P, Award No. 76, Case No. 76 of Public Law Board 5811).

In 2016, a dispute arose where Plaintiff's Chairman Houk alleged Defendant was violating the collective bargaining agreement by utilizing "engineers to fill temporary conductor vacancies on a regular basis…" while Defendant maintained that employees with conductor service seniority, who are working as engineers, may be required to protect their train service seniority. (R. 42-2, PageID# 865, 867, Exhs. H & I). A subsequent letter from Defendant to Plaintiffs asserted that they had agreed to handle any future conflicts on this issue as minor disputes (R. 42-2, PageID# 869, Exh. J), a position Shepard attests that was never challenged by Houk. (R. 42-2, PageID# 809, Shepard Decl. at ¶25). Plaintiffs' opposition asserts that "Houk did not agree that the issue was minor, nor did he treat the issue as minor going forward." (R. 46, PageID# 1358). However, Plaintiffs point to no evidence suggesting that Houk ever challenged the assertion that "the Organization acknowledged that any further progression of this issue would be done in accordance with the grievance and time claim provisions of the applicable schedule agreement"[10] in any follow-up email, letter, conversation, or phone call.

---

[10] *See* R. 42-2, PageID# 809, Shepard Decl. at ¶25.

In an April 28, 2021 email, SMART-TD General Chairman Tommy Gholson protested that an employee, holding a position as an engineer, was being required to fill multiple days of a conductor vacancy "and this should only be for one day only until there are rested CO's." (R. 42-2, PageID# 871, Exh. K).[11]  Shepard takes the position that Chairman Gholson's email "acknowledged that NSR had the right to require the employee working as an Engineer to protect the temporary Conductor vacancy; he simply complained that NSR should release the employee from the temporary vacancy when rested employees normally assigned as Conductors became available." (R. 42-2, PageID# 809, Shepard Decl. at ¶26). Though Gholson's declaration claims that his email "appear[s] to be taken out of context," reading paragraph thirteen of his declaration as a whole, the import of his statement is that a conductor is required to be called, rather than an engineer, if a rested conductor is available. (R. 46-1, PageID# 1366, Gholson Decl. at ¶13).

On August 11, 2021, a SMART-TD Local Chairman took the position that the collective bargaining agreement required Defendant to call him to protect a vacancy in a conductor position despite being an engineer. (R. 42-2, PageID# 809-810, 874 Shepard Decl. at ¶27 and Exh. L). Plaintiffs contend that under SMART-TD's structure, a Vice Local Chairperson has no authority to make or interpret the parties' agreements or to bind the GCA (R. 46-1, PageID# 1367, Gholson Decl. at ¶14), and the Court does not find the Local Chairman had the authority to bind Plaintiffs. Nevertheless, the position taken is suggestive of an on-the-ground understanding of the parties' past practice different from the position Plaintiffs have espoused here.

The parties are indeed free to resolve this long-standing disagreement, and appear to have

---

[11] Shepard indicated that "[w]hen filling a multiple-day vacancy at an outlying location, it is common for NSR to require the employee to protect the vacancy for multiple days (where the employee is provided lodging and meals) to avoid unproductive travel time back and forth to the outlying location (referred to as 'deadheading')." (R. 42-2, PageID# 809, Shepard Decl. at ¶26).

addressed portions of these disagreements through the flowback agreements. Given the lack of any explicit discussion of these practices in the 1984 crew consist agreements, which did not contemplate the change in engineer staffing occurring the following year that has given rise to these disagreements, the Court cannot accept Plaintiffs' position that the crew consist agreements prohibited a practice that seems to have endured for over thirty years. Indeed, past practice overwhelmingly supports the conclusion that Defendant has asserted a non-frivolous position. Consequently, this dispute is minor and must proceed to arbitration.

## IV.  Conclusion

For the foregoing reasons, the Court finds that the parties have a minor dispute. Defendant's motion for summary judgment (R. 42) is hereby GRANTED, while Plaintiffs' motion for summary judgment (R. 43) is DENIED. The Court DISMISSES this case for lack of subject-matter jurisdiction.

IT IS SO ORDERED.

s/ *David A. Ruiz*

David A. Ruiz
United States District Judge

Date: September 24, 2025